UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| STEPHANIE LYNN LICCIARDI | * | CIVIL ACTION NO.: |
| AND KERRI LOPEZ | * | 26-123 |
| | * | |
| VERSUS | * | SECTION: "H" |
| | * | |
| SIG SAUER, INC. | * | JUDGE: JANE TRICHE MILAZZO |
| | * | |
| | * | MAGISTRATE JUDGE: |

PLAINTIFFS' FIRST AMENDING AND SUPPLEMENTAL COMPLAINT

NOW INTO COURT, through undersigned counsel, come **STEPHANIE LYNN LICCIARDI** ("Ms. Licciardi" or "Plaintiff") and **KERRI LOPEZ** ("Ms. Lopez") (hereinafter collectively referred to as "Plaintiffs"), who respectfully file their First Amending and Supplemental Complaint[1] asserting the following:

## I. PARTIES

1.      Plaintiff, **STEPHANIE LYNN LICCIARDI,** a natural person of the full age of majority and a citizen and domiciliary of St. Tammany Parish, State of Louisiana.

2.      Plaintiff, **KERRI LOPEZ,** a natural person of the full age of majority and a citizen and domiciliary of St. Tammany Parish, State of Louisiana, who at all relevant times was lawfully married to Ms. Licciardi.

3.      Defendant, **SIG SAUER, INC.,** a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 72 Pease Boulevard,

---

[1] Plaintiffs submit this First Amended Complaint in compliance with this Court's Order, R. Doc. 12. Plaintiffs hereby adopt and incorporate by reference all allegations contained in the Original Complaint, as if copied here *in extenso*, except as otherwise supplemented or amended herein.

Newington, New Hampshire. Defendant is a "manufacturer" within the meaning of La. R.S. 9:2800.53(1).

## II. JURISDICTION

4.     This Court has subject-matter jurisdiction over this action under 28 U.S.C.A. §1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. This case is brought pursuant to the Louisiana Products Liability Act ("LPLA"), La. R.S. 9:2800.51, *et seq.*

5.     This Court has personal jurisdiction over Defendant because Defendant purposefully availed itself of the Louisiana market by designing, manufacturing, marketing, selling, and distributing firearms, including the product at issue, that were sold and used in Louisiana.

## III. VENUE

6.     Venue is proper in the United States District Court for the Eastern District of Louisiana pursuant to 28 U.S.C. §1391(b), given that the events giving rise to this claim occurred within the district of this Honorable Court..

## IV. FACTS

7.     **SIG SAUER, INC.** (hereinafter referred to as "SIG" or "Defendant") is a leading designer and manufacturer of firearms, which designed, manufactured, marketed, sold, and/or placed into the stream of commerce the Sig Sauer Model P320 semi-automatic pistol (the "P320").

8.     In January 2014, SIG introduced its P320 in North America.

9.     The P320 was marketed and sold for use by military and law-enforcement personnel, including police officers required to carry and holster the firearm during the course and scope of employment.

10.    Since the P320 inception, there have been hundreds of reported un-commanded discharges of the P320 involving federal agents, state and local police officers, and civilians, in which the P320 goes off by itself.

11.    Several lawsuits brought by individual plaintiffs, and at least three class actions, have been filed against SIG alleging that the P320 is defective, poorly made, and dangerous.

12.    Plaintiff, Stephanie L. Licciardi, is a Senior Public Safety Officer employed by the LCMC Police Department, in Louisiana.

13.    Plaintiff is a highly trained and experienced firearm user who has completed formal police academy weapons training, participates in mandatory annual firearms requalification, and has received additional private firearms instruction beyond standard law-enforcement requirements.

14.    Plaintiff purchased a Sig Sauer P320 firearm from SIG, as required by the employer for duty use.

15.    On October 27, 2025, at approximately 8:00 a.m., Plaintiff was on duty and exiting the behavioral unit after assisting in the de-escalation of a physical altercation.

16.    Plaintiff was standing upright in a normal, balanced position when she placed the P320 pistol into a Safariland holster, as weapons are prohibited within the behavioral unit.

17.    As the firearm was being holstered in a normal and foreseeable manner, the P320 discharged a single round **without an intentional trigger pull or other intentional activation by Ms. Licciardi.**

18. At the time of the discharge, Plaintiff was engaging in a normal, foreseeable use of the firearm, specifically holstering the weapon, in a manner consistent with the product's intended purpose.

19. Plaintiff was acting within the course and scope of her employment at all relevant times.

20. Following the incident, Ms. Licciardi's employer conducted an investigation into the discharge of the subject P320.

21. Upon information and belief, Ms. Licciardi's employer is in possession of video footage depicting the incident, which shows that Ms. Licciardi did not pull the trigger, manipulate the firearm, or otherwise engage in any conduct that would have caused the P320 to discharge.

22. Upon completion of the investigation, Ms. Licciardi's employer determined that Plaintiff committed no error or misconduct, or policy violation in connection with the incident and that the discharge was not caused by any intentional action on her part.

23. The uncommanded discharge caused Plaintiff to suffer a gunshot wound to her right thigh, with the bullet exiting near her knee, resulting in severe physical injuries, pain and suffering, medical expenses, emotional distress, and other damages.

24. As a result of the injuries Ms. Licciardi's sustained from the discharge of the subject P320, Ms. Licciardi has been deemed eligible for and is currently receiving workers' compensation benefits.

25. Plaintiff's finger was not on the trigger, nor did Plaintiff manipulate the trigger in any manner at the time of discharge.

26.    Upon information and belief, the bullet was a hollow-point round, which fragmented upon impact. Today, bullet fragments remain lodged in Plaintiff's leg and are currently pressing on nerves, causing chronic pain, neurological symptoms, and difficulty ambulating.

27.    Plaintiff now walks with a limp, experiences frequent pain, and has difficulty sleeping due to nerve pain.

28.    Plaintiff routinely cleaned and maintained the firearm and made no modifications to the firearm or the holster.

29.    The firearm and holster were used exactly as intended and in a foreseeable manner.

30.    Plaintiff never received any notice indicating that the Sig Sauer P320 model had been subject to recalls.

31.    As a result of the injuries, Plaintiff has been unable to return to work and has suffered substantial wage loss, financial hardship, and emotional distress, among other damages.

## V. CAUSES OF ACTION

## LOUISIANA PRODUCTS LIABILITY ACT ("LPLA")

32.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

33.    The LPLA provides the exclusive theories of recovery against a manufacturer for damages caused by its product.[2]

34.    Defendant designed, manufactured, marketed, and sold the Sig Sauer Model P320 pistol.[3]

---

[2]    La. Stat. Ann. § 9:2800.52

[3]    La. Stat. Ann. § 9:2800.53(1)

35.    Defendant is liable under the LPLA as the P320 was **unreasonably dangerous** in one or more of the following respects:

### COUNT I - DESIGN DEFECT[4]

36.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

37.    The P320 is a striker-fired, semi-automatic pistol that was introduced to the market in 2014 and received rave reviews from gun enthusiasts.  For instance, in January 2017 the P320 won the Modular Handgun System ("MMS") competition and earned a $580 million contract to supply service pistols to all branches of the U.S. military.

38.    Beginning in or around 2016, reports of the P320's unintentional discharges, weather from "drop fires" or from instances where, like here, the trigger was never pulled at all, began to surface.  These early reports concluded that the P320 was defective because of the design of its trigger and sear.

39.    Upon information and belief, testing and evaluation conducted in connection with military procurement of the P320 identified safety concerns relevant to the risks alleged herein, further placing SIG on notice of issues associated with the firearm.

40.    The Army demanded a change in the design, and SIG obliged.  SIG did not, however, implement a mandatory recall of its P320.  Instead, on August 8, 2017, SIG implemented the P320 Voluntary Upgrade Program ("VUP"), which was primarily implemented to ensure the P320 was "drop safe."[5]

---

4        La. Stat. Ann. § 9:2800.56

5        https://www.sigsauer.com/p320-voluntary-upgrade-program

"The P320® Voluntary Upgrade Program is a SIG SAUER initiative to upgrade P320 pistols *at no additional cost.* This will include an alternate design that reduces the physical weight of the trigger, sear, and striker while additionally adding a mechanical disconnector."

41.    As set forth on SIG's website, the "no cost" VUP included "an alternate design that reduces the physical weight of the trigger, sear, and striker while additionally adding a mechanical disconnector." On the VUP's frequently asked questions page,[6] SIG answers the question of whether the P320 was safe in its current configuration:

42.    The FAQs explain that the reason for the upgrade is because "a potential discharge of the firearm may result when dropped[,] although "it is a rare occurrence" and occurs "usually after multiple drops, at certain angles and conditions[.]" SIG further confirms that an external manual safety will not be installed as part of the upgrade.

43.    Upon information and belief, these design "upgrades" were automatically added to the P320s manufactured after the initiation of the VUP in 2018, but SIG has never required the return of any defective P320 firearm.

44.    The design changes implemented by SIG failed to remedy the defects in the P320, as reports of unintentional and uncommanded discharges continued to occur after the modifications, including in the subject firearm at issue in this litigation.

45.    Upon information and belief, the pertinent defects which SIG has failed to remedy include the P320's extremely light trigger pull and the P320's lack of any external safeties.

46.    The P320's trigger weight ranges between 5.5 and 7.5 pounds.

47.    A striker-fired pistol, as the P320, differs from the traditional "hammer-fired."

48.    The P320 has no external hammer to be pulled back by the thumb; rather, the P320, has an internal "striker" that is held back under constant spring pressure like a bow and arrow.

---

[6]    https://www.sigsauer.com/p320-voluntary-upgrade-program#faqs

"**Is my P320 safe in its current configuration?** Yes. The P320 meets and exceeds all US safety standards. However, mechanical safeties are designed to augment, not replace safe handling practices. Careless and improper handling of any firearm can result in an unintentional discharge."

49.   Once the slide is moved or "racked" backward, the weapon is fully cocked. The only component holding the striker back is the weapon's "sear."

50.   Plaintiff's P320 should not have discharged without the trigger being pulled, holstered or un-holstered.

51.   Today, numerous reports, lawsuits, injury claims, and consumer complaints involving alleged unintended and uncommanded discharges of P320 pistols have been reported nationwide.

52.   Upon information and belief, those incidents demonstrate a recurring pattern of alleged discharges occurring without an intentional trigger pull during ordinary and reasonably foreseeable use of the firearm, including circumstances substantially similar to those presented in this case.

53.   The P320's propensity to "go off by itself" has also been widely reported on the news. For instance:

54.   *"AG Platkin, SAFE Office, and Division of Consumer Affairs Sue Sig Sauer Over Defective P320 Handgun:* Lawsuit Demands Recall of Gun that Fires Unintentionally, Linked to Deaths and Injuries Nationwide."[7]

55.   *"Guard says SIG P320 fired unexpectedly at USAA Guard Gate."*[8] On March 18, 2025, a routine day at Security Gate 4 on USAA's San Antonio campus turned into a safety scare when a security officer's service weapon unexpectedly discharged.[9]

---

[7]   https://www.njoag.gov/ag-platkin-safe-office-and-division-of-consumer-affairs-sue-sig-sauer-over-defective-p320-handgun/

*"Lawsuit Demands Recall of Gun that Fires Unintentionally, Linked to Deaths and Injuries Nationwide"*

[8]   https://www.youtube.com/watch?v=o8n2rU137S4

[9]   *Id.*

56.    *"Florida official urges law enforcement to suspend SIG Sauer P320 use."*[10] "A Florida legislator is asking law enforcement agencies to stop using a widely-issued handgun after a series of unintentional discharges raised alarms about safety."[11]

57.    *"Wisconsin Cop Shot with His Own Sig Sauer P320 Pistol – Negligence or Defect?"*[12] "A Wisconsin police officer accidentally shot himself while drawing his pistol during a pursuit in December..."[13]

58.    *"Gun manufacturer Sig Sauer faces legal battles over alleged safety flaw."*[14] "The same gun used by more than 1,500 troopers with the North Carolina State Highway Patrol is facing criticism for unintentionally firing without anyone pulling the trigger. A growing number of law enforcement officers and others have sued Sig Sauer over the manufacturer's P320."[15]

59.    *"Sig Sauer Loses Bid to DQ Experts in Accidental Firing Case."*[16]

---

[10]    https://www.youtube.com/watch?v=-qtO33MlT6I

[11]    *Id.*

[12]    https://www.youtube.com/watch?v=TFT-g-9CPmg

[13]    *Id.*

[14]    https://www.youtube.com/watch?v=dWbisv8yocs

[15]    *Id.*

[16]    https://www.smbb.com/news-article/sig-sauer-loses-bid-to-dq-experts-in-accidental-firing-case/

"Law360 (March 19, 2025) - The Sixth Circuit on Tuesday rejected Sig Sauer's petition for the full court to disqualify expert testimony that its P320 pistol was defectively designed because it lacked safety features used in other firearms."

"The gunmaker had sought en banc review of a decision allowing the experts to opine in support of claims that the Sig Sauer Inc.-made gun is prone to firing unintentionally. Sig Sauer is the target of numerous personal injury lawsuits across the country from gun owners who say their P320 pistols discharged without pulling the trigger."

"The Sixth Circuit's denial of Sig Sauer's petition leaves intact a published Jan. 27 decision finding a pair of experts could testify that the design of the pistol made it easier for the gun to be discharged unintentionally when compared to rival products, and that Sig Sauer failed to use external safety mechanisms found in other guns."

60. Additionally, in 2016, the Police Department of Surprise, Arizona, complained to SIG of two separate incidents of P320s discharging without an intentional trigger pull.

61. In October 2016, a P320 fired uncommanded on retired New York Police Department officer Thomas Frankenberry in South Carolina, severely injuring him. The spent casing did not eject.

62. In November 2016, a P320 fired uncommanded on an officer in Holmes beach, FL. striking him in his leg.

63. On January 5, 2017, a P320 shot uncommanded, hitting a Stamford SWAT team member in his left knee when the P320 fell to the ground, while fully holstered, from less than three feet.

64. On February 28, 2017, a P320 discharged uncommanded while in use by the University of Cincinnati Police Department.

65. On June 14, 2017, a P320 discharged uncommanded in Wilsonville, Oregon.

66. On June 20, 2017, a P320 discharged uncommanded while in use by the Howell Township Police Department in New Jersey.

67. On July 28, 2017, a P320 discharged uncommanded in Tarrant County, Texas.

68. In February 2019, a class action lawsuit was brought against SIG in the United States District Court for the Southern District of Texas, which related to the P320's propensity to "drop fire"

69. On August 9, 2017, the police chief of Morrow, Georgia, issued an emergency order removing the P320 from service.

70.    On July 24, 2019, a P320 fired uncommanded on Jimmy S.C. Jinn, a United States Homeland Security agent, at a firing range in the Bronx, New York, resulting in permanent nerve damage to his leg.

71.    On September 3, 2019, another P320 in use by the sheriff's office in Loudon County Virginia fired uncommanded on another deputy sheriff, Carl Costello, hitting him in his leg.

72.    On December 2, 2019, a P320 fired uncommanded while in possession of CPD Detective, David Albert, as he was in the process of putting on his duty belt.

73.    In January 2020, a fully holstered P320 fired uncommanded on an Army veteran, Tanner Larson, in Utah, penetrating his leg and impacting his femur bone.

74.    On February 27, 2020, a fully holstered P320 fired uncommanded on a retired Tampa police officer, Robert Northrop, causing catastrophic bone damage to his lower left leg.

75.    On July 14, 2020, a P320 fired uncommanded on the partner of an officer who was attempting to subdue a suspect in Milwaukee, Wisconsin, causing him serious injuries.

76.    In December 2020, a P320 fired uncommanded on a second ICE agent at a firing range in Tennessee.  The bullet resulted in a tunnel wound to her right thigh.

77.    On May 15, 2021, a fully holstered P320 fired uncommanded on a DC Metro Transit Police Department officer inflicting thermal burns along her right thigh.

78.    In June 2021, a P320 fired uncommanded on a police officer at a firing range in Troy, New York, severely injuring his right leg.

79.    On August 12 2021, a P320 fired uncommanded on an Army veteran in Texas when the P320 fell from approximately 18 inches from a nightstand.

80.    In November 2022, thirty-three plaintiffs filed suit against SIG in the United States District Court for the District of New Hampshire, alleging that their P320 pistols discharged without an intentional trigger pull.

81.    Those allegations mirror the circumstances of this case, in which the subject P320 discharged without an intentional trigger pull by Plaintiff or any other person.

82.    These concerns continue to amount.    In October 2024, the Washington State Criminal Justice Training Commission issued a memo stating that the Commission "has become aware of a serious safety concern with the Sig Sauer P320," and that "during a Basic Law Enforcement Academy firearms training, a student experienced a premature discharge with their agency issued firearm," which led the Commission to discover a separate incident involving the P320 in Washington state earlier in 2024.    Accordingly, the Commission decided that the Commission "will not authorize the use of the Sig Sauer P320 in our agency-owned or contracted training facilities until further notice."

83.    In November 2024, a CBS News outlet reported on, and polished video footage of, an officer who was nearly killed when the P320 discharged in his holster while he was walking.[17]

84.    In response to the ever-growing number of incidents of the P320 unintentional discharging, several law enforcement agencies and training academies across the country have banned further used of the P320, including but not limited to, the Dallas Police Department,[18] the

---

[17]    *It Happened Again: Texas officer injured by holstered Sig Sauer P320*, CBS – Austin (Nov. 1, 2024); https://www.youtube.com/watch?v=b1rZFIfcK38: "A disturbing trend has emerged involving the SIG SAUER P320 pistol, with two recent incidents in Texas highlighting potential safety concerns."

[18]    The Dallas Police Department (DPD) banned further use of the P320 on July 31, 2017.

Marble Falls Police Department,[19] the Milwaukee Police Department,[20] the Washington State Criminal Justice Training Commission,[21] the Northern California Regional Public Safety Training Authority,[22] SEPTA Transit Police in Philadelphia,[23] the Chicago Police Department,[24] the Houston Police Department,[25] and the U.S. Department of Homeland Security has also prohibited U.S. Immigration and Customs Enforcement ("ICE") Authorized Officers from carrying the P320 as their duty weapon.[26]

85.     As a result of the numerous reported incidents involving alleged uncommanded discharges of the P320, including the incidents described herein, several law enforcement agencies, military units, and firearms training academies have discontinued, restricted, or replaced the P320

---

[19]   The Marble Falls Police Department (MFPD) recalled and pulled the SIG Sauer P320 from service on September 24, 2024.

[20]   The Milwaukee Police Department (MPD) effectively banned the use of the Sig Sauer P320 as a duty weapon in October 2022. Following safety concerns and a lawsuit filed by the police union, department leadership and city officials announced on October 31, 2022, that they would replace all P320s with Glock pistols.

[21]   The Washington State Criminal Justice Training Commission (WSCJTC) temporarily banned the SIG Sauer P320 from its training facilities in October 2024. This was later formalized and made a permanent policy on February 24, 2025, following a formal investigation into reports of uncommanded discharges.

[22]   The Northern California Regional Public Safety Training Authority (NCRPSTA) banned the use and presence of the SIG Sauer P320 at its training facilities in early November 2024. The ban was implemented amid growing nationwide concerns regarding uncommanded discharges and pending investigations involving the handgun

[23]   The SEPTA Transit Police in Philadelphia officially pulled their SIG Sauer P320 pistols from service and banned their use in September 2019. The agency made the decision after an incident on August 26, 2019, where an officer's holstered P320 discharged unexpectedly inside Suburban Station during the evening rush hour. Following the incident, SEPTA removed all 350 of the weapons and replaced them with Glock pistols.

[24]   The Chicago Police Department (CPD) temporarily banned the Sig Sauer P320 as a prescribed duty weapon on February 28, 2025. Shortly after, the department's Arsenal Committee voted unanimously in April 2025 to permanently phase it out due to concerns of accidental discharges.

[25]   The Houston Police Department officially banned the use of the Sig Sauer P320 as a duty weapon in early August 2025. The order was issued following a lawsuit filed by a Houston patrol officer who was injured in January 2025 when his holstered pistol allegedly discharged spontaneously.

[26]   On July 9, 2025, a U.S. Department of Homeland Security memorandum directed U.S. Immigration and Customs Enforcement to discontinue operational use of the P320 and transition to a different model.

with alternative handgun platforms, including Glock pistols, due to concerns regarding the safety and reliability of the P320.

86. SIG possesses specialized expertise in firearms engineering, product design, testing, and safety systems and has designed, manufactured, marketed, distributed, and sold the P320 pistol platform for many years.

87. Through product testing, field performance data, consumer complaints, law enforcement reports, warranty claims, incident investigations, and litigation, SIG knew or should have known of numerous reports alleging unintended discharges involving the P320.

88. Notwithstanding such knowledge, the P320 contained defects in its design, safety mechanisms, manufacturing process, and/or quality-control systems that rendered the firearm capable of discharging without an intentional trigger pull under certain foreseeable conditions, including the circumstances presented in this case.

89. SIG's P320s are defective and unreasonably dangerous, because the P320s functioned in a manner not reasonably expected by an ordinary consumer of firearms, namely, by discharging without an intentional trigger pull during ordinary and reasonably foreseeable carrying, holstering, possession, and use, including under the circumstances presented in this case.

90. SIG's P320 pistols are defective and unreasonably dangerous in design and/or construction because they are capable of firing without an intentional trigger pull. Such a discharge is contrary to the reasonable expectations of an ordinary firearm consumer and renders the P320 unreasonably dangerous for its intended and reasonably foreseeable use.

91. Here, as a direct result of the P320's defects, Ms. Licciardi's P320 discharged without an intentional trigger pull while being holstered in a normal and foreseeable manner, causing severe injuries to Plaintiff.

92.    Upon information and belief, the P320 was unreasonably dangerous in design because SIG designed the firearm in a manner that permitted an unintended and uncommanded discharge absent an intentional trigger pull.  Specifically, upon information and belief, the P320 was defectively designed in one or more of the following respects:

A.  The P320 was designed without an external manual safety capable of preventing unintended discharges in all reasonably foreseeable conditions of use;

B.  The P320 was designed without a trigger-mounted safety mechanism capable of preventing unintended trigger movement and unintended discharges;

C.  The P320 was designed with inadequate internal safety mechanisms and striker-retention features to reliably prevent unintended striker release absent an intentional trigger pull;

D.  The P320 was designed without sufficient redundant safety systems capable of preventing unintended or uncommanded discharges in the event of component movement, wear, tolerance stacking, impact, vibration, or other reasonably foreseeable operating conditions;

E.  The P320 was designed in a manner that permitted internal fire-control components to move, disengage, or otherwise interact in a way that could result in striker release without an intentional trigger pull;

F.  The P320 was designed with component dimensions, weights, geometries, tolerances, and mechanical relationships that increased the risk of an unintended or uncommanded discharge;

G.  Safer alternative designs existed and were technologically and economically feasible at the time the P320 left SIG's possession and control, including an external

manual safety, a trigger-mounted safety, enhanced striker-blocking mechanisms, additional redundant internal safeties, a mechanical disconnect mechanism, alternative striker-sear engagement geometry, and alternative component dimensions, weights, and tolerances designed to prevent unintended striker release absent an intentional trigger pull.

**H.** Any additional design defects and safer alternative designs that may be revealed through discovery and/or proven at trial.

93. Upon information and belief, the foregoing alternative designs were capable of materially reducing or eliminating the risk of unintended and uncommanded discharges without impairing the utility, performance, reliability, accuracy, durability, or intended function of the P320.

94. The existence of SIG's Voluntary Upgrade Program further demonstrates that alternative designs were technologically and economically feasible because SIG subsequently implemented modifications to the trigger, sear, striker, and related fire-control components, including the addition of a mechanical disconnect mechanism, in an effort to address safety concerns associated with the P320 platform. Upon information and belief, the safer alternative designs identified herein would have prevented or substantially reduced the likelihood of the uncommanded discharge that injured Ms. Licciardi.

95. Upon information and belief, SIG elected not to implement available alternative safety features and mechanisms despite the existence of technologically and economically feasible alternatives capable of reducing or eliminating the risk of unintended discharges.

96.     These design defects rendered the P320 unreasonably dangerous for its intended and reasonably foreseeable use and were a direct and proximate cause of Officer Licciardi's injuries and resulting damages.

## COUNT II - MANUFACTURING DEFECT[27]

97.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

98.     SIG manufactures firearms, including the P320 at issue, in the United States.

99.     Instead of acknowledging the dangerous defects associated with the P320, SIG and its sellers have doubled-down claiming there is nothing wrong with the P320 and attributing reports of uncommanded discharges to user error or unfounded allegations.

100.     The P320 exposes users to an unreasonable risk of serious bodily injury because it is capable of discharging without an intentional trigger pull.

101.     Despite notice of numerous reported incidents involving alleged uncommanded discharges, SIG continued to market and distribute the P320.

102.     Not only has SIG failed to acknowledge the defects alleged to exist in the P320's design, but SIG has continued to represent and promote the P320 as a safe and reliable firearm despite numerous reported incidents involving alleged uncommanded discharges.[28]

---

[27]     La. Stat. Ann. § 9:2800.55

[28]     https://www.sigsauer.com/firearms/pistols/p320.html

"**TESTED AND ABUSED**: With its unmatched modularity, unprecedented accuracy, and uncompromising reliability, the state-of-the-art SIG SAUER P320 has quickly become one of the most sought after firearms on the market today."

"**SAFETY WITHOUT COMPROMISE**: Safety isn't negotiable. The P320 maximizes peace of mind with a robust safety system including both a striker safety and a disconnect safety, and because of its innovative 3-point takedown safety, never again will you need to pull the trigger to disable your pistol."

103.    In SIG's "Safety Without Compromise" marketing materials for the P320, SIG states: "*We have design safety elements into every necessary feature on this pistol. From the trigger to the striker and even the magazine, the P320 won't fire unless you want it too.*"

104.    Despite these express representations, Plaintiff's P320 discharged without an intentional trigger pull, consistent with hundreds of other reported P320 discharge incidents.

105.    Upon information and belief, SIG continued to evaluate, modify, and redesign aspects of the P320 platform in response to safety concerns associated with unintended and uncommanded discharges.

106.    On May 10, 2017, the Department of Defense submitted an urgent Engineering Change Proposal concerning the prototype of the military version of the P320.

107.    The Engineering Change Proposal provides further evidence that SIG possessed actual knowledge of safety concerns and performance issues associated with the P320 before announcing the 2017 VUP.

108.    The Engineering Change Proposal demanded that the P320's entire internal firing system be replaced.

109.    The Engineering Change Proposal further corroborates that SIG knew, or should have known, that the P320 presented an unreasonable risk of unintended and uncommanded discharges.

110.    SIG sold the P320 firearm to Plaintiff.

111.    Ms. Licciardi's P320 contained manufacturing defects at the time the P320 left the possession of SIG and deviated in its construction and/or quality from its specifications or planned output in a manner that rendered the P320 unreasonably dangerous.

112. Specifically, upon information and belief, the P320 possesses a defective striker-fired fire-control system characterized by an inadequate striker-to-sear engagement interface, inadequate internal striker safety features, and excessive horizontal and vertical tolerances among critical internal components within the slide assembly and between the slide and frame.

113. Further, manufacturing defects, including metal rollover, burrs, and irregularities on critical engagement surfaces, reduce the available bearing surface between mating components and compromise the integrity of the striker retention system.

114. Upon information and belief, the foregoing conditions constituted deviations from SIG's intended manufacturing specifications, dimensional tolerances, quality-control standards, assembly requirements, machining requirements, finishing requirements, and performance standards applicable to the P320 platform.

115. Upon information and belief, the subject P320 departed from SIG's intended manufacturing specifications, dimensional tolerances, assembly requirements, machining requirements, finishing requirements, quality-control standards, and/or performance specifications in a manner not present in properly manufactured P320 pistols.

116. Upon information and belief, the excessive tolerances, dimensional deviations, burrs, metal rollover, surface irregularities, inadequate striker-sear engagement, inadequate internal striker safety conditions, and other defects alleged herein constituted deviations from SIG's intended manufacturing specifications and planned output for the P320 platform.

117. Upon information and belief, these deviations existed at the time the subject P320 left SIG's possession and control and rendered the firearm capable of discharging without an intentional trigger pull during ordinary and reasonably foreseeable carrying, holstering, possession, handling, and use.

118.    Upon information and belief, the subject P320 departed from SIG's intended design and manufacturing specifications in a manner not present in properly manufactured P320 pistols.

119.    These defects render the striker-sear interface unstable, increase the risk of striker release absent an intentional trigger pull, and make the firearm susceptible to unintended and uncommanded discharges, including the discharge at issue in this case.

120. Plaintiffs P320 was dangerous to an extent beyond that which would be contemplated by the ordinary user of the firearm with the ordinary knowledge common to the community as to the P320's characteristics, namely because the Plaintiff's P320 discharged without an intentional trigger pull while being holstered in a normal and foreseeable manner.

121.    SIG, by and through its agents, servants, employees, contractors, designers, assemblers, manufacturers, sellers, suppliers, and/or distributors, is liable because:

A. SIG is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320, which injured Plaintiff.

B. The P320 involved in the subject litigation was marketed and/or placed in the general stream of commerce by SIG.

C. The P320 involved in this litigation was expected to, and did, reach users without substantial change in the condition in which the P320 was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce.

D. Upon information and belief, the subject P320 contained construction and composition defects at the time the P320 left SIG's possession and control.

E. The defective and unreasonably dangerous condition of the subject P320 was a direct and proximate cause of Ms. Licciardi's injuries and resulting damages.

122.  Upon information and belief, the P320 was in a defective condition as:

A. Critical internal components of the subject P320 deviated from SIG's manufacturing specifications, performance standards, and intended design when the firearm left SIG's possession and control;

B. The striker-sear engagement interface contained construction, composition, manufacturing, assembly, machining, and/or finishing defects that compromised the reliable retention of the striker;

C. The internal striker safety mechanism contained construction, composition, manufacturing, assembly, machining, and/or finishing defects that impaired its ability to consistently prevent unintended striker release;

D. Critical internal components contained excessive tolerances, dimensional deviations, burrs, metal rollover, surface irregularities, and/or other manufacturing defects that adversely affected the operation of the firearm's fire-control and safety systems;

E. The foregoing defects compromised the reliability and stability of the P320's fire-control and safety systems;

F. The foregoing defects rendered the P320 capable of discharging without an intentional trigger pull, including during ordinary and reasonably foreseeable carrying, holstering, possession, and use;

**G.** The foregoing defects rendered the P320 unstable, unsafe, and unreasonably dangerous for its intended and reasonably foreseeable use;

**H.** Any additional construction, composition, manufacturing, assembly, machining, finishing, inspection, or quality-control defects that may be revealed through discovery and/or proven at trial.

123.    The subject firearm deviated in a material way from SIG's specifications and intended design when it left SIG's control. This deviation rendered the firearm unreasonably dangerous and was a direct and proximate cause of the uncommanded discharge and the injuries sustained by Ms. Licciardi.

## COUNT III - FAILURE TO WARN[29]

124.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

125.    SIG's website also includes a video which highlights "The Safety Features of the P320."[30]  In that video, SIG claims that the P320 will only fire once each of the following five events occur:[31] "(1) Trigger Is pressed to the rear moving the trigger bar forward; (2) Captive safety lever rotates upward; (3) Striker safety lock rotates upward; (4) Sear rotates downward; [and] (5) Striker pin is released."[32]

126.    However, what SIG claims in its video is inconsistent with numerous reported incidents involving alleged uncommanded discharges because there have been hundreds of

---

[29]    La. Stat. Ann. § 9:2800.57

[30]    https://www.sigsauer.com/firearms/pistols/p320.html.

[31]    *Id.*

[32]    *Id.*

reported cases nationwide of the P320 discharging without the trigger ever being pulled, including but not limited to the Plaintiff's P320.

127. At the very least, SIG has failed to warn the general public of the P320's propensity to unintentionally discharge. As a result of this, Ms. Licciardi sustained severe and life-altering injuries.

128. On March 7, 2025, SIG issued a public statement attempting to deflect responsibility for the numerous reported incidents involving alleged uncommanded discharges of P320 pistols.[33] Those incidents have repeatedly resulted in severe injuries to law enforcement officers, military personnel, veterans, and civilian firearm owners, including Ms. Licciardi.

---

[33] https://www.sigsauer.com/blog/the-truth-about-the-p320:
"**NEWINGTON, N.H., (March 7, 2025)** – The P320 CANNOT, under any circumstances, <u>discharge</u> without a trigger pull – that is a fact. The allegations against the P320 are nothing more than individuals seeking to profit or avoid personal responsibility.

Recently, anti-gun groups, members of the mainstream media, trial attorneys, and other uninformed and agenda-driven parties have launched attacks on one of SIG SAUER's most trusted, most tested, and most popular products - the P320 <u>pistol</u>. In all cases, these individuals have an ulterior motive behind their baseless allegations that the P320 can fire without a trigger pull; they have no evidence, no data and no empirical testing to support any of their claims. They instead choose to misrepresent clear, negligent discharges as a "design problem."

In the decade since its introduction, the P320 has undergone the most rigorous testing and evaluation of any firearm, by military and law enforcement agencies around the world. It consistently delivers a proven record of performance and reliability through state-of-the-art engineering, and documented quality control at every stage of its production. Claims that unintended discharges are anything more than negligent handling and/or manufactured lies to support an anti-gun, anti-SIG agenda are false. Furthermore, lawsuits claiming that the P320 is capable of firing without the trigger being pulled have been dismissed in courtrooms around the country. In addition, multiple plaintiffs' so-called experts have conceded, it is not possible for the P320 to discharge unless the trigger is fully actuated.

The rhetoric is high, and we can no longer stay silent while lawsuits run their course, and clickbait farming, engagement hacking grifters continue their campaign to highjack the truth for profit. Enough is enough. From the courts of law to the court of public opinion we will combat the lies and misinformation with the truth. SIG SAUER stands behind the quality, <u>safety</u>, and design of all our products – especially the P320.

Industry, take notice; what's happening today to SIG SAUER with the anti-gun mob and their lawfare tactics will happen tomorrow at another firearms manufacturer, and then another. Today, for SIG SAUER - it ends."

129.    SIG closes its *"The Truth About the P320"* statement by stating: "Industry, take notice; what's happening today to SIG SAUER with the anti-gun mob and their lawfare tactics will happen tomorrow at another firearms manufacturer, and then another.  Today, for SIG SAUER - it ends."

130.    Upon information and belief, SIG has known for years that the P320 is capable of discharging without an intentional trigger pull and has received notice of numerous reported incidents, claims, lawsuits, consumer complaints, law enforcement reports, and injury-causing events involving alleged uncommanded discharges.  Despite such information, SIG has continued to market and promote the P320 as a safe and reliable firearm while failing to provide adequate warnings regarding the risk of an uncommanded discharge.

131.    Additionally, SIG states in the Frequently Asked Questions section of its website that the P320's striker safety prevents the striker from being released unless the trigger is pulled. Upon information and belief, numerous reported incidents involving alleged uncommanded discharges of P320 pistols are inconsistent with that representation.[34]

132.    Despite knowledge of the numerous reported incidents involving alleged uncommanded discharges of P320 pistols, SIG has continued to make false, misleading, incomplete, and/or ambiguous safety representations while omitting material safety information concerning the risk of uncommanded discharges.

133.    As demonstrated by the foregoing marketing materials, SIG repeatedly represented and assured consumers that the P320 was a safe firearm whose internal safety mechanisms would

---

[34]     https://www.sigsauer.com/p320-safety-technical-standards

   **"Is the P320 drop safe?** The P320 meets and exceeds ANSI/SAAMI, NATO, NIJ, and TOP industry drop-test standards. Its internal striker safety lock prevents the striker from releasing unless the trigger is moved to the rear."

prevent an unintentional discharge, while failing to disclose and adequately warn of the known or reasonably knowable risk that the P320 could discharge without an intentional trigger pull, thereby providing false, misleading, and incomplete safety information to Plaintiff and other end users.

134.    SIG's public statements concerning the safety of the P320 constitute misleading and incomplete representations because they omit material information regarding the frequency of reported uncommanded discharge incidents, the nature of the defects alleged herein, and the risks posed to consumers. Rather than adequately warning users, law enforcement agencies, military personnel, and civilian firearm owners of those risks, SIG has continued to deny the existence of the defects alleged herein.

135.    At the same time, SIG has been forced to defend numerous lawsuits throughout the United States arising from allegations that P320 pistols discharged without an intentional trigger pull. Despite the growing number of claims and reported incidents, SIG has continued to place the P320 into the stream of commerce without providing adequate warnings or taking sufficient corrective action to protect consumers, including Ms. Licciardi.

136.    This action seeks recovery for injuries and damages caused by the defective condition of the P320 and SIG's failure to adequately warn consumers of the risks associated with the firearm, including Ms. Licciardi.

137.    Despite possessing actual knowledge of numerous injuries, fatalities, claims, lawsuits, and reported incidents involving alleged uncommanded discharges of the P320, SIG continued to market and sell the firearm without providing adequate warnings or safety advisories regarding the risk that the P320 could discharge without an intentional trigger pull.

138.    SIG's failure to disclose and warn of these known risks rendered the P320 unreasonably dangerous and directly contributed to the injuries sustained by Ms. Licciardi.

139.    Despite knowledge of safety defects with the P320's fire control unit and build quality as early as February 2016, if not long before, SIG has failed to issue a mandatory recall of the P320s.

140.    SIG failed to provide adequate warnings, instructions, and safety advisories sufficient to alert Plaintiff, law enforcement agencies, military personnel, and other end users to the risk that the P320 could discharge without an intentional trigger pull during ordinary and reasonably foreseeable carrying, holstering, possession, and/or use.

141.    The absence of adequate warnings rendered the P320 unreasonably dangerous for its intended and reasonably foreseeable use and was a substantial factor in causing Plaintiff's injuries.

142.    At all relevant times, Ms. Licciardi was unaware that the P320 was capable of discharging without an intentional trigger pull during ordinary and reasonably foreseeable carrying, holstering, possession, and use.

143.    Ms. Licciardi reasonably relied upon SIG's warnings, instructions, marketing materials, safety representations, and other communications concerning the safety and operation of the P320.

144.    SIG knew, or in the exercise of reasonable care should have known, that the P320 was capable of discharging without an intentional trigger pull during ordinary and reasonably foreseeable carrying, holstering, possession, and/or use.

145.    Despite such knowledge, SIG failed to adequately notify or warn Ms. Licciardi of this risk, either before or after her purchase of the P320, thereby depriving her of material safety information necessary to make informed decisions regarding the firearm's use, handling, storage, and continued possession.

146. At all relevant times, Ms. Licciardi was unaware that the P320 was allegedly capable of discharging without an intentional trigger pull during ordinary and reasonably foreseeable use.

147. Had SIG adequately warned the P320's user, including Ms. Licciardi, that the P320 was capable of discharging without an intentional trigger pull during ordinary and reasonably foreseeable carrying, holstering, possession, and/or use, Ms. Licciardi would not have purchased and/or continued using the P320 and would not have been exposed to the risk that materialized in this case.

148. Accordingly, but for SIG's failure to provide adequate warnings, instructions, and material safety information concerning the P320's propensity to discharge without an intentional trigger pull, Ms. Licciardi would not have purchased and/or continued using the P320, and the incident made the basis of this litigation would not have occurred.

149. SIG's failure to provide adequate warnings, instructions, and material safety information regarding the risk of an uncommanded discharge deprived Ms. Licciardi of information necessary to make informed decisions regarding the purchase, possession, carrying, and/or use of the P320 and was a direct, producing, and proximate cause of Plaintiffs' injuries and resulting damages.

150. SIG failed, and continues to fail, to adequately warn Plaintiff and the general public of the risks associated with the use, carrying, possession, and foreseeable handling of the P320 pistol, including the risk that the firearm may discharge without an intentional trigger pull, as alleged herein.

151. SIG's failure to provide adequate warnings and safety information regarding the risk of unintentional and uncommanded discharges associated with the P320 was a substantial factor and proximate cause of the injuries and damages sustained by Ms. Licciardi.

152. Despite implementing design changes to the P320, SIG knew or should have known that reports of unintentional and uncommanded discharges continued to occur after those modifications. Nevertheless, SIG failed to provide adequate warnings, instructions, safety advisories, or other communications informing Plaintiff and other end users that the risk of an uncommanded discharge allegedly remained present in modified P320 pistols, including the subject firearm.

153. SIG's refusal to issue a mandatory recall is compounded by SIG's full knowledge of serious wounds inflicted upon numerous law enforcement agents and civilians across the country over the last ten years to the present date, whether the P320 is in its original or upgraded form.

154. SIG is engaged in the business of designing, manufacturing, marketing, advertising, selling, distributing, and placing firearms into the stream of commerce, including the P320 pistol that caused Plaintiff's injuries.

155. SIG knew of the ordinary purposes for which the P320 was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes, which included being carried, possessed, holstered, unholstered, and otherwise used in a reasonably foreseeable manner.

156. At all relevant times, Ms. Licciardi used the P320 in its intended and reasonably foreseeable manner, reasonably relying upon SIG's skill, judgment, representations, and implied warranties regarding the firearm's safety and fitness for its intended use.

157.    SIG failed to use reasonable care to adequately warn purchasers and end users of the P320, including Ms. Licciardi, of the known and/or reasonably knowable risks associated with the firearm, thereby rendering the P320 unreasonably dangerous due to an inadequate warning. Specifically, SIG:

A. Failed to adequately and unambiguously warn purchasers and end users of the P320, including Ms. Licciardi, of the risk that the firearm could discharge without an intentional trigger pull;

B. Failed to provide conspicuous, clear, and understandable warnings regarding the risk of an uncommanded discharge on the firearm's packaging, case, product inserts, marketing materials, website, and other locations reasonably likely to be reviewed by consumers;

C. Failed to disclose material safety information concerning the nature, frequency, and severity of reported incidents involving alleged uncommanded discharges of P320 pistols;

D. Failed to provide adequate post-sale warnings, safety advisories, corrective communications, or other notices sufficient to alert existing P320 owners, including Ms. Licciardi, to the risks associated with the P320;

E. Failed to initiate, issue, or conduct an adequate recall despite possessing actual or constructive knowledge of numerous reported incidents involving alleged uncommanded discharges;

F. Failed to adequately inform consumers that the Voluntary Upgrade Program did not eliminate the risk of uncommanded discharges, despite continuing reports of such incidents after implementation of the program;

**G.** Failed to provide adequate warnings and instructions sufficient to allow consumers to appreciate the nature and extent of the risks associated with the P320.

**H.** Any additional failures to warn, omissions, or inadequate safety communications that may be revealed through discovery and/or proven at trial.

158. At all relevant times, SIG made express warranties and representations concerning the safety, reliability, and operation of the P320.

159. In purchasing, possessing, carrying, and continuing to use the P320, Ms. Licciardi reasonably relied upon SIG's express representations that the firearm would not discharge unless the trigger was intentionally pulled and that the firearm's internal safety mechanisms would prevent unintended discharges.

160. The subject P320 failed to conform to those express representations when it discharged without an intentional trigger pull, causing the injuries and damages alleged herein.

161. The P320 was unreasonably dangerous in design, construction and composition, due to inadequate warnings, and because it failed to conform to SIG's express warranties, as more fully set forth herein.

162. The subject P320 failed to conform to those express warranties, thereby rendering the firearm unreasonably dangerous. Specifically, SIG:

**A.** Expressly represented and warranted that the P320 would not discharge unless the trigger was pulled;

**B.** Expressly represented and warranted that the P320's internal safety mechanisms prevented unintended discharges;

**C.** Expressly represented and warranted that the P320 was a safe and reliable firearm for its intended use;

**D.** Expressly represented and warranted that the P320 incorporated safety features designed to prevent unintended striker release;

**E.** Continued to make public assurances regarding the safety of the P320 despite possessing information inconsistent with those assurances;

**F.** The subject P320 failed to conform to the foregoing express warranties because it discharged without an intentional trigger pull;

**G.** Ms. Licciardi reasonably relied upon SIG's express warranties and representations regarding the safety and operation of the P320, which resulted in her injuries and Plaintiffs' damages.

## VI. LOSS OF CONSORTIUM[35]

163.    Plaintiffs incorporate by reference all prior paragraphs and allegations in support of this claim.

164.    At all relevant times, Ms. Licciardi was lawfully married to her spouse, **KERRI LOPEZ**, and their marital relationship existed at the time of the incident made the basis of this action.

165.    SIG is liable to **MS. LOPEZ** for loss of consortium because:

**A.** The acts, omissions, defects, failures to warn, and breaches of warranty attributable to SIG caused severe and permanent injuries to Ms. Licciardi;

**B.** As a direct and proximate result of Ms. Licciardi's injuries, Ms. Lopez has suffered and continues to suffer the loss of love, affection, companionship, comfort, society, support, aid, assistance, and consortium;

---

[35]    La. Civ. Code Ann. art. 2315

C. Ms. Licciardi's injuries have substantially interfered with and impaired the marital relationship between Ms. Licciardi and Ms. Lopez;

D. Ms. Licciardi's injuries have impaired her ability to provide the care, services, assistance, companionship, support, and other benefits of the marital relationship that she would have otherwise provided to Ms. Lopez;

E. The damages and losses sustained by Ms. Lopez were a direct, foreseeable, and proximate result of the injuries suffered by Ms. Licciardi as a result of the defects, failures to warn, and breaches of warranty alleged herein.

## VII. DAMAGES

166. Plaintiffs incorporate by reference all prior paragraphs and allegations in support of this claim.

167. As a direct and proximate result of the defective condition of the P320, SIG's inadequate warnings, SIG's breaches of express warranty, and the other acts and omissions alleged herein, Plaintiffs have sustained and will continue to sustain damages, including but not limited to:

A. Physical pain and suffering, past and future;

B. Mental anguish, emotional distress, and psychological injuries, past and future;

C. Medical expenses and healthcare costs, past and future;

D. Physical disability, impairment, and loss of physical function, past and future;

E. Loss of enjoyment of life and loss of life's pleasures, past and future;

F. Scarring, disfigurement, and permanent physical injury;

G. Lost wages, lost earnings, and loss of earning capacity, past and future;

H. Property damage and other economic losses, to the extent proven at trial;

**I.** Loss of consortium, companionship, society, affection, support, services, and other damages sustained by Ms. Lopez as a result of the injuries suffered by Ms. Licciardi;

**J.** Pre-judgment and post-judgment interest as allowed by law; and

**K.** Any and all other damages recoverable under applicable law and proven at trial.

## VII. JURY DEMAND

168.    Plaintiffs are entitled to and demand a trial by jury on all issues presented herein and as to all Claims.

## IX. PRAYER FOR RELIEF

169.    **WHEREFORE,** Plaintiffs, **STEPHANIE LYNN LICCIARDI** and **KERRI LOPEZ,** respectfully pray that, after due proceedings are had, there be judgment in their favor and against Defendant, **SIG SAUER, INC.,** awarding all damages recoverable under applicable law arising from Defendant's defective design, construction and composition defects, inadequate warnings, and nonconformity to express warranties, including but not limited to damages for physical pain and suffering, mental anguish, emotional distress, disability, impairment, loss of enjoyment of life, scarring and disfigurement, past and future medical expenses, lost wages, loss of earning capacity, and all other economic and non-economic losses proven at trial; awarding **MS. LOPEZ** all damages recoverable for loss of consortium, companionship, society, affection, services, support, and related losses recognized under Louisiana law; awarding pre-judgment and post-judgment interest as allowed by law; assessing all costs of court against Defendant; granting Plaintiffs a trial by jury on all issues so triable as a matter of right; and awarding Plaintiffs all other legal and all other legal relief to which Plaintiffs may be entitled.

**[SIGNATURE BLOCK AND CERTIFICATE OF SERVICE ON THE FOLLOWING PAGE]**

Respectfully Submitted,

**KOEPPEL, LLC**

*/ s. / Peter S. Koeppel*

**PETER S. KOEPPEL (BAR No. 1465)**
**BIBIANA O. VALLECILLA (BAR No. 40003)**
650 Poydras St. Suite 2150
New Orleans, La. 70130
Telephone: (504)598-1000
Facsimile: (504)524-1024
psk@koeppelllc.com
bvallecilla@koeppelllc.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that, on the date set forth below, the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system and that it will be available for viewing and downloading on the Court's CM/ECF system by the parties. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system on this 8th day of June 2026.

*/ s. / Peter S. Koeppel*

**PETER S. KOEPPEL**